AARON MOSKO AND JEAN MOSKO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mosko v. Commissioner
Docket No. 13408-81.
United States Tax Court
T.C. Memo 1986-447; 1986 Tax Ct. Memo LEXIS 156; 52 T.C.M. (CCH) 520; T.C.M. (RIA) 86447; September 17, 1986. James A. Clark and Kathryn A. Nielson, for the petitioners. Benjamin A. de Luna, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a $330,698.50 deficiency in petitioners' 1977 income tax and a $16,535 addition to tax under section 6653(a). [1] The issues for decision are: (1) whether respondent correctly determined petitioners' gross income; (2) whether petitioners are entitled to an additional deduction for cost of goods sold;
*157 (3) whether petitioners are entitled to a deduction for interest on funds borrowed against a life insurance policy for the purpose of paying the policy's premiums; (4) whether petitioners are liable for the addition to tax under section 6653(a) for negligence or the intentional disregard of rules and regulations; and (5) whether petitioners are entitled to use income averaging under sections 1301-1305. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by reference. Petitioners, Aaron Mosko and Jean Mosko, husband and wife, resided in Denver, Colorado, at the time they filed their petition herein. They filed a joint income tax return for 1977 with the Internal Revenue Service Center in Ogden, Utah. Aaron Mosko ("petitioner") was born in 1912. He has a high school education, and at the time of the trial had been in automobile sales both wholesale *158 and retail for approximately 50 years. During 1977, petitioner owned and operated A.M. Motor Company ("A.M."), an automobile dealership and The Spot Shop, an automobile body repair and paint shop. He was the co-owner (50/50) with Michael Tallman ("Tallman") of M.T. Company ("M.T."), a used car business. All three businesses had checking accounts with the Southwest State Bank ("Southwest"). In the operation of A.M., petitioner purchased automobiles from other dealers, auction houses, corporations or individuals. The automobiles were repaired and refurbished when needed. They were then sold on A.M.'s lot or at auctions. At least part of A.M.'s inventory was financed through an informal "floor plan" with Southwest. Under the plan petitioner would pay for an automobile in case or by check.He would then deposit the title for the automobile with Southwest and receive a loan in the amount of the purchase price. When the vehicle was sold petitioner would repay the loan to Southwest, recover the title and deliver it with the car to the purchaser. On a retail sale, the purchaser paid A.M. for any city, county, and state sales tax due on the purchase and such tax was deposited in A. *159 M.'s account. A.M. would pay any tax due on behalf of the customer soon after the sale. Petitioner maintained his own business and accounting records. They consisted of a file for sales invoices, a sales register, an inventory card filing system, a check register, and a monthly summary of the business activities. During 1977, thirty checks totaling $69,840 were issued by A.M. to petitioner's friends and members of his family. In addition, eight checks totaling $12,272 were issued by A.M. to The Spot Shop and on A.M.'s check register were allocated $3,256.50 to repair charges and $9,015.79 to "exchanges." On Schedule C to their income tax return for 1977, petitioners reported a loss computed as follows: INCOME
Gross receipts or sales
$1,043,644.00 Less: Cost of goods sold
953,165.00 Gross Profit
$ 90,479.00 DEDUCTIONS
Depreciation
$ 3,478.00 Taxes on business and
business property
3,708.00 Salaries and wages
42,536.00 Insurance
2,567.00 Legal and professional fees
1,060.00 Interest on business indebtedness
11,807.00 Other business expenses
30,773.00 Total Deductions
$ 95,929.00 Net Loss
$ (5,450.00)
*160 Utilizing the bank deposit slips of A.M. and M.T. as well as petitioners' records, respondent determined that petitioners had underreported their income for 1977 by $539,104. [2] In respondent's computation the deposits were added to arrive at total deposits of $2,270,594.48 for A.M. and $114,133.63 for M.T. Respondent then identified and subtracted nontaxable deposits in order to arrive at taxable deposits as follows: A.M.'s Account
Total Deposits
$2,270,594.48
Credit Memos
$ 1,081.00
Returned Checks Redeposited
57,719.00
Loans at Southwest State Bank
316,124.00
Advances from Able Motor Co.
335,085.00
Sales Tax Collected
5,681.00
Loan at Metro Bank
45,000.00
Total Non-Taxable Deposits
760,690.00
A.M.'s Taxable Deposits (Gross Receipts)
$1,509,904.48
M.T.'s Account
Total Deposits
$ 114,133.63
Advances from Able Motor Co.
$16,729.00
Loan at Metro Bank
10,000.00
Total Non-Taxable Deposits
26,729.00
M.T.'s Taxable Deposits (Gross Receipts)
$ 87,404.63
From the combined taxable deposits for both *161 companies of $1,597,309.11, respondent subtracted the gross receipts and the other items of income that petitioners had reported on their return to arrive at his computation of their unreported income. The computation is as follows: Total Gross Receipts
1,597,309.11
Interest and Dividends
$706.00
Schedule C Gross Receipts
1,043,644.00
Proceeds from Sale of Stock
11,041.00
Gross Rental
12,361.00
Other
53.00
Amount put in Escrow
9,600.00
Total Gross Receipts per Return
* 1,058,205.00
Unreported Income (Rounded)
* $ 539,104.00
In addition to the adjustment for unreported income, respondent also disallowed a deduction of $2,417 for interest incurred on funds borrowed against a life insurance policy for the purpose of paying the premiums on the policy. In the fall of 1983 or the winter of 1984, rains flooded a portion of the record storage facilities of Southwest. In the flood, Southwest's copies of petitioners' deposit records were destroyed. At the trial, the parties stipulated that the taxable deposits *162 determined by respondent should be reduced by $21,383. They also stipulated that petitioners were entitled to an increase of $142,236 in the cost of goods sold reported on their return. On brief respondent conceded that 50 percent of the gross receipts of M.T. Company belonged to Tallman and not to petitioner. OPINION Computation of Gross Income
Petitioners contend that respondent's determination of their gross income by use of the bank deposits should be further adjusted for (1) loans to A.M. from petitioners' friends and members of his family; (2) loan repayments from the Spot Shop to A.M.; and (3) sales tax payments made to A.M. by retail customers. Respondent's determination of petitioners' unreported income is presumptively correct and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners argue that respondent's calculation of their taxable deposits erroneously includes $69,840 in loans from petitioner's friends and family members to A.M. Respondent contends that petitioners have failed to establish that such loans were made. In support of his argument, respondent insists that the *163 record contains no documentation or other evidence of any such loans. We disagree with respondent for the reasons set forth below. First, at the trial petitioner in a forthright and credible manner identified thirty of A.M.'s checks totaling $69,840 which were made payable during 1977 to individuals, and which, according to his testimony, represented repayments by A.M. of short term loans usually of only a day or two in duration made to A.M. by the payees on the checks. His testimony was to the effect that in order to purchase cars he had followed the practice during 1977, as well as in other years, of obtaining such checks from his friends and family and depositing them to A.M.'s account. After purchasing the cars and paying for them with checks on A.M.'s account, he would use the car titles to borrow the full purchase price from Southwest and deposit the borrowed funds in A.M.'s account. At that point the identified checks were issued in payment of the original loans. Consequently, contrary to respondent's argument, the record contains the only documentation that Mr. Mosko ever had of the loans, i.e., the various checks issued to repay them. It is interesting to note that *164 respondent's agent admitted that all such checks were available to him during the audit but he apparently failed to comprehend their importance. Further support for petitioners' position on this item is found in the admitted use by petitioner of the informal floor plan with Southwest. The use of the personal checks for very short term loans immediately before the floor planning with Southwest resulted in a double deposit in A.M.'s account for each such loan. In his computation of taxable deposits, respondent correctly eliminated the proceeds of the loans from Southwest but erroneously failed to remove those from the individual lenders. Petitioners also contend that respondent's computation of A.M.'s deposits should be adjusted for the checks payable to The Spot Shop totaling $9,015.79 which were identified as exchanges on A.M.'s register. Again pointing to the lack of documentation, respondent contends that these amounts are not loans. However, we again note that petitioner in a forthright and credible manner testified that the "exchanges" were in actuality short-term loans made by A.M. to The Spot Shop in order to enable The Spot Shop to pay a bill or meet some other obligation, *165 that such loans were promptly repaid by The Spot Shop almost by the exchange of checks, and that the repayment checks were deposited in A.M.'s account during 1977. With these checks and Mr. Mosko's credible testimony in explanation, we are satisfied that petitioners have carried their burden of proving that respondent's computation erroneously included the $9,015.79 in taxable deposits. Petitioners further contend that respondent's determination of taxable deposits is erroneous because it includes $8,199 paid to A.M. by its customers in payment of their city, county and state sales taxes. Respondent contends that petitioners have failed to establish that A.M. had received sales tax deposits in excess of the $5,681 he allowed in the notice of deficiency. The record, however, contains forty checks totaling $7,976 issued by A.M. during 1977 to the city, county and state taxing authorities on behalf of A.M.'s customers. Therefore, respondent's determination of taxable deposits is overstated by the difference of $2,295 between the actual sales tax deposits of $7,976 and the $5,681 in sales tax deposits used by respondent in the notice of deficiency. Additional Cost of Goods *166 Sold
On their 1977 return petitioners claimed a deduction for cost of goods sold in the amount of $953,435. At trial respondent agreed to increase the deduction by $142,236. On brief respondent has conceded that an additional deduction of $2,750 should be allowed for A.M.'s purchase of a 1974 Mustang and a 1974 van. Petitioners, however, still contend they are entitled to an additional adjustment of $99,824. We agree with respondent that no further adjustment to the cost of goods sold is warranted because petitioners have not attempted to reconcile their additional claims with the cost of goods sold as shown on the tax return for 1977 and our attempt to make such a reconciliation has proved futile due to the illegibility in part of A.M.'s check register, the lack of any notation on a large number of A.M.'s checks, and petitioner's sketchy factual presentation. Therefore, respondent's determination on this issue is sustained. Interest Deduction
In the deficiency notice, respondent disallowed a deduction for interest in the amount of $2,417 which was incurred by petitioners on funds borrowed against a life insurance policy to pay the premiums on the policy. Petitioners *167 have not seriously contested this part of respondent's determination and may have conceded it. In any event, it is sustained because a deduction is not allowable for "any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance * * * contract * * * pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract * * *." Section 264(a)(3). Negligence
Respondent determined that petitioners are liable for the addition to tax provided by section 6653(a) because they substantially underreported their income and failed to maintain adequate records. Respondent's determination is presumed to be correct and petitioners have the burden of proving otherwise. Welch v. Helvering,supra;Otis v. Commissioner,73 T.C. 671 (1980); Rule 142(a). In defense to the negligence claim, petitioners cite petitioner's advanced age during the year at issue, his limited education, the flood's destruction of the bank's copies of *168 his deposit slips, the fact that he kept his own books and records, and a completely unsupported allegation that respondent lost his records. We see no relevance to the fact that the bank's copies of the deposit slips were destroyed and that petitioners were unable to locate other records at the time of trial since petitioners do not deny that these records were available to them when their return was prepared. As to the other assertions, we note that at the time of trial petitioner had successfully operated three businesses for nearly 50 years and in 1977 at the age of 65 was astute and intelligent enough to operate a business with annual sales in excess of $1,000,000. Since these are not indications that we are declaing with an individual so hampered by age and lack of education as to be incapable of maintaining adequate business records and accurately reporting his income, we sustain respondent's determination with respect to the addition to tax under section 6653(a). Income Averaging
The last issue is whether petitioners are entitled to the benefits of computing their tax by the income averaging method provided in sections 1301-1305. Respondent contends that petitioners *169 are not entitled to such benefits since "no evidence was adduced to support this allegation of error." In Hosking v. Commissioner,62 T.C. 635 (1974), we held that an election to average income under sections 1301-1305 could be made at any time "while the year involved is still open to agjustment." 62 T.C. at 641. However, the taxpayer must be prepared to show that sufficient information is available to compute the tax imposed under section 1301. Critical to such a determination is the amount of taxable income for each of the four years preceding the year for which the computation is made. [3] In those cases where a late claim of income averaging has been permitted, the record contained all of the evidence necessary to make such a computation and the issue was raised no later than trial. Cloes v. Commissioner,79 T.C. 933, 935 (1982); see Combs v. United States,490 F. Supp. 19 (E.D. Ky. 1978), affd. on this issue 655 F.2d 90 (6th Cir. 1981); Hosking v. Commissioner, supra.
*170 While the year in dispute here is still open to adjustment, the record before us contains no evidence of the amount of petitioner's taxable income for the preceding four years. Therefore, petitioners are not entitled to the benefits if any of income averaging in this case. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended during the year in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩
2. Respondent only examined the deposits in A.M. and M.T.'s accounts, and not the Spot Shop's account.↩
*. The gross receipts per petitioners' return total $1,077,405.00; therefore, unreported income (rounded) is $519,904.00.↩
3. For computation years beginning after December 31, 1983, the base period is the three years preceding the computation year.↩